Joshua S. Evett
ELAM & BURKE, P.A.
251 East Front Street Suite 300
Post Office Box 1539
Boise, Idaho 83701
Telephone:  (208) 343-5454
Facsimile:  (208) 384-5844
jse@elamburke.com
ISB #5587

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST BANK OF IDAHO, <br><br>                 Plaintiff, <br><br>     v. <br><br> RICHARD J. COLEMAN, SHANNON B. CONKLIN, GLENN J. JANSEN, AND RONALD J. KAYE, JR. <br><br>                 Defendants. | Case No. <br><br> **COMPLAINT AND JURY DEMAND** |

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for First Bank of Idaho,

Ketchum, Idaho ("FDIC-R"), for its Complaint, alleges as follows:

## I.     **INTRODUCTION**

1. The Federal Deposit Insurance Corporation ("FDIC") brings this case in its

capacity as Receiver for First Bank of Idaho ("First Bank" or the "Bank") pursuant to authority

granted by 12 U.S.C. § 1821.

COMPLAINT AND JURY DEMAND - Page 1

2.      The FDIC-R seeks to recover damages estimated to be in excess of $11 million that former First Bank officers Richard J. Coleman ("Coleman"), Shannon B. Conklin ("Conklin"), Glenn J. Jansen ("Jansen"), and Ronald J. Kaye, Jr. ("Kaye") (collectively, the "Defendants") caused the Bank to incur.  The FDIC-R reserves the right to amend this Complaint to allege additional damages.

3.      The Defendants breached their fiduciary duties to First Bank and were negligent and grossly negligent by, among other things, underwriting and recommending for approval, in violation of the First Bank Credit Policy (the "Credit Policy") and prudent, safe, and sound lending practices, at least three loans between May 2005 and January 2007 that resulted in damages to the Bank (the "Loans").  The Defendants are liable for the damages that the Bank suffered as a result of their negligence, gross negligence, and breaches of fiduciary duties.

4.      The FDIC-R seeks recovery of damages the Bank suffered that were caused by the Defendants' breaches of their duties to the Bank, including their negligence, gross negligence, and breaches of fiduciary duties in violating the Bank's policies and prudent, safe, and sound banking practices.  In this lawsuit, the FDIC-R does not seek to collect upon outstanding loans or for a lender's liability or other claim for acts performed by the Defendants for the Bank's lending customers.  Rather, the FDIC-R seeks to collect damages the Bank suffered from the Defendants' breaches of duty to the Bank, damages flowing from the Defendants' performance of acts and omissions for the Bank that were negligent, grossly negligent, and breached their fiduciary duties, which include, among other things, lost operating capital, lost profits, and lost investment opportunities.

## II.      PARTIES

5.      Plaintiff is the FDIC in its capacity as Receiver of First Bank, pursuant to 12 U.S.C. § 1811, *et seq*.  Prior to its failure, deposits in First Bank were insured by the FDIC.  On April 24, 2009, the Office of Thrift Supervision ("OTS") closed First Bank and the FDIC was

appointed as Receiver.  Under 12 U.S.C. § 1821(d)(2)(A), the FDIC-R has, among other powers, all rights, titles, powers, and privileges of First Bank, and of account holders, depositors, and stockholders with respect to First Bank and its assets.

6.     Defendant Coleman is a former officer of the Bank.  Coleman was the Bank's Senior Vice President and Senior Credit Officer ("SCO") from October 2004 until the Bank was closed in April 2009.  Coleman was the final reviewer and recommending authority for all three Loans and was responsible for presenting the Loans to the Bank's Credit Policy Committee ("CPC") for final CPC approval.  Coleman currently resides in Hailey, Blaine County, Idaho.

7.     Defendant Conklin is a former officer of the Bank.  Conklin was a loan officer at First Bank from 2001 through March 2007.  Conklin currently resides in Ketchum, Blaine County, Idaho.

8.     Defendant Jansen is a former officer of the Bank.  Jansen started at the Bank in 2002 as a commercial loan officer.  In early 2007, he became President of the Bank's Jackson, Wyoming market division.  Jansen currently resides in Jackson, Wyoming.

9.     Defendant Kaye is a former officer of the Bank.  Kaye was a vice president and loan officer at the Bank's branch in Jackson, Wyoming.  Kaye joined the Bank in 2002 and resigned in May 2007.  Kaye currently resides in Jackson, Wyoming.

### III.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction for this action pursuant to 12 U.S.C. § 1811 *et seq.*, 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345.  The FDIC is a corporation organized and existing under the laws of the United States of America, and brings this action in its receivership capacity.  Pursuant to 12 U.S.C. § 1819(b)(2)(A), actions to which the FDIC is a party are deemed to arise under the laws of the United States.  The FDIC, including in its capacity as Receiver, has the authority to sue and complain in any court of law. 12 U.S.C. § 1819.

COMPLAINT AND JURY DEMAND - Page 3

11.     This Court has personal jurisdiction over Defendants Coleman and Conklin, who are residents of and at all relevant times conducted business in the state of Idaho.

12.     This Court has personal jurisdiction over Defendants Jansen and Kaye under the Idaho Long-Arm Statute, Idaho Code § 5-514, and in accordance with the Due Process Clause of the United States Constitution.  Jansen and Kaye have sufficient contacts with the state of Idaho, having engaged in the transaction of business and the commission of tortious acts within the state from which the causes of action herein arose.  Consequently, the exercise of personal jurisdiction by this Court is proper and does not offend any traditional notions of fair play or substantial justice.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because all or substantially all of the acts and omissions alleged herein occurred in this District or occurred with respect to real property located in this District and the FDIC-R's claims arose in this District.

## IV.     FACTUAL BACKGROUND

### A.     A Brief History of First Bank

14.     First Bank was established in 1997 as a state-chartered bank.  In 2001, First Bank became a federally chartered stock savings association that was subject to the regulation and supervision of the OTS.  The Bank was headquartered in Ketchum, Idaho and was wholly owned by Sun Valley Bancorp.  First Bank had seven branches that were spread across Blaine and Teton counties in Idaho and Teton County in Wyoming, and the Bank's primary market consisted of the affluent resort and mountain tourist areas of Sun Valley, Idaho and Jackson Hole, Wyoming.  The OTS closed First Bank on April 24, 2009.

### B.     First Bank's Credit Policy

15.     First Bank's Credit Policy set forth requirements for originating and underwriting loans.  The Bank also had separate policies for each major product line.  For example, the Bank

COMPLAINT AND JURY DEMAND - Page 4

had a Construction Policy and a Residential Lending Policy.

16.     The Credit Policy was a "guide for loan officers for making sound credit judgments and protecting the major asset of the bank—its loan base."  For every consumer, commercial, and real estate loan, the Credit Policy required a loan officer to prepare a "Standard Credit Memo" ("Credit Memo").  The purpose of the Credit Memo was to present "a clear, complete argument for the credit" application so that the approving authority could "make an informed credit decision."  Loan officers needed to "support[ ] their argument[s] with the results of analysis and research, including historical and current information."  Specifically, loan officers were required to offer a "recommendation" on and provide "additional analysis" of the following factors: (1) the primary source of repayment; (2) the secondary source of repayment; (3) key credit risks and mitigating factors; (4) an evaluation of the business and management, if applicable; (5) an evaluation of the guarantor, if applicable; and (6) a financial evaluation.

17.     Under the Credit Policy, loan officers were expected to complete "the logical and necessary analysis warranted by the proposed [loan], including, but not limited to a thorough assessment of the financial and other characteristics of the [borrower]."  Loan officers were further expected to use the Credit Memo as a "risk-surfacing" tool.  The Credit Policy provided that "[n]egative information and conclusions, weaknesses, etc. must be clearly surfaced and discussed" in the Credit Memo.  In addition, the Credit Policy provided that the "Key Credit Issues which must be very carefully identified and explained include[d]" the "value of Secondary Sources of Repayment in the likely downside that would exist" if repayment from those sources became necessary.  In addition, the Credit Policy instructed loan officers to "[i]ndicate if the Secondary Source is Independent/Dependent on the same assets and/or business activities as the Primary Source of Repayment."

18.     If the approval of a particular loan application would have resulted in a violation of the Credit Policy, the loan officer was required to request an exception to the Credit Policy

and discuss any mitigating factors in the Credit Memo.  At the bottom of the Credit Memo's cover page, the officers on the account, including the SCO, would indicate their recommendation for approval by signing next to the term, "Recommend."  If the SCO did not recommend a loan, the loan would not be presented to the CPC for approval.

19.     The Credit Policy required prospective borrowers and guarantors to submit signed loan applications, along with signed financial statements.  For an individual loan applicant, the Credit Policy required an evaluation of the person's "[i]ntegrity in the management of [the person's] affairs," "[c]apacity to meet financial obligations," and "[a]cceptable asset / liability proportions."  For residential loan applicants, underwriting was based on "the 4 C's of credit"— character, capacity, capital, and collateral.  "Character relate[d] to a borrower's willingness to pay his/her obligations and adhere to contractual agreements and fulfillment of commitments."  Capacity related to the "ability to meet fixed debt obligations . . . from income sources that are predictable, recurring and consistent."  Capital related to an applicant's liquidity, capital at risk, and net worth.  Collateral was the Bank's security.  "The principal tool . . . to evaluate collateral [wa]s the real estate appraisal and the analytic tool used [wa]s the loan to value ratio ["LTV"]."  The Credit Policy also required "a credit report or documented credit investigation."

20.     With respect to an applicant's capital, the Credit Policy instructed loan officers to, among other things, "[i]dentify, validate and support valuation of major assets" and "[i]dentify legal and percentage ownership of major assets."  As to capacity, the Credit Policy instructed loan officers to, among other things, "[e]xplain major changes in cash inflows or outflows."  And, for both capital and capacity, the Credit Policy stated "[e]xplain material items which are not self-explanatory."

21.     The Credit Policy required loans to have clearly defined primary and secondary sources of repayment.  In addition, the Credit Policy required a focused analysis of the risk of default under the proposed credit structure, including an evaluation of any risk-mitigating factors

COMPLAINT AND JURY DEMAND - Page 6

and the viability of the secondary repayment sources.  Speculative credits were required to have secondary sources of repayment that were well-defined, preferably liquid, and not subject to the project itself.

22.     The Bank's Credit Policy and other loan underwriting policies and procedures also set forth specific quantitative requirements.  For example, land development loans could be approved for a maximum term of 24 months with a maximum LTV of 75%, based on the appraised value of the finished lots discounted back to bulk-sale value.  If an LTV exceeded 70%, the Credit Policy required a minimum credit score of 700.  In addition, the Credit Policy required the Credit Memo to analyze and discuss the loan-to-cost ratio ("LTC") for the development project.  The Credit Policy also required a 25% equity contribution, in cash or in kind, for real estate acquisition and development loans.

23.     In addition, the Credit Policy provided that "[s]econd mortgages on construction loans are acceptable only if subordinate to a First Bank of Idaho lien, and **must** not have a combined loan-to-value ratio for the first and second mortgages that exceeds" the Credit Policy's LTV maximums for construction loans.  (Emphasis in original.)  The Credit Policy defined combined LTV as the "aggregate principal balances of all mortgages on a property divided by its appraised value."

24.     The Credit Policy further provided for development loans that "[l]ot inventory should not exceed the number of lots the borrower will be able to sell over a twenty-four month period based on market data.  The Loan Officer should consider the time needed to develop the lots, as well as the time needed to sell them."  In addition, the loan officer needed to know "the market for the types of lots being proposed" and understand the marketing plan and the quality of the sales agent who would be responsible for selling the lots.

25.     The Credit Policy required careful review of collateral appraisals.  Appraisals were required to conform to the Uniform Standards of Professional Appraisal Practice

COMPLAINT AND JURY DEMAND - Page 7

("USPAP").  The Bank maintained a list of approved appraisers, and loan officers were expected to engage appraisers from that list.  In addition, appraisals needed to be current.  An appraisal was generally considered current if it was not more than one year old, but material changes in local market conditions could shorten the period of time for which an appraisal would be considered current.  Loan officers were required to review appraisals to ensure that they met the Bank's minimum standards.  To extend or renew a loan, the Credit Policy required the account's loan officer to review updated financial and credit information.  In addition, the Credit Policy required that the collateral still be adequate.

26.     The Credit Policy cautioned loan officers that they needed "to be particularly aware of the quality of the borrower on Construction/Permanent loans."  For construction loans, the Credit Policy provided that an examination of the borrower's financial condition was vitally important in order to determine the borrower's ability to "carry the loan if necessary."  In addition, loans to consumers to build a home or to builders for a pre-sold home required a permanent financing commitment.  The LTC limit for a loan to build a custom home was 75%.  In addition, the Credit Policy identified unusual architecture as an undesirable property characteristic.

27.     Under the Credit Policy, the Loans required the CPC's approval.  The members of the CPC were the CEO and at least two non-officer directors.  The SCO was not a voting member of the CPC, but he facilitated its meetings and signed the minutes that recorded which loans were submitted to the CPC and the conditions of the CPC's approval or ratification.  The CPC met twice per month to review, approve, and ratify loans.  The minutes of those meetings reflected the discussion of any exceptions to the Credit Policy that were recommended in the Credit Memos.

COMPLAINT AND JURY DEMAND - Page 8

C.    **The Defendants' Negligent and Grossly Negligent Acts and Breaches of Fiduciary Duties**

28.    As officers of First Bank, the Defendants had duties to the Bank to follow the Credit Policy and to exercise due care in underwriting the Loans and recommending them for approval.

29.    Between May 2005 and January 2007, the Defendants breached their duties to the Bank by causing the Bank to approve loans that would not have been made had the Defendants complied with First Bank's Credit Policy, followed prudent, safe, and sound lending practices, and conducted the required due diligence, including basic loan underwriting, for the Bank.

30.    The Defendants' repeated violations of First Bank's Credit Policy and prudent, safe, and sound lending practices occurred throughout the lending process the Defendants performed for the Bank.  The acts and omissions the Defendants' performed for the Bank in their underwriting and recommendation of the Loans were negligent, grossly negligent, and breached their fiduciary duties to the Bank.

31.    But for the Defendants' wrongful conduct, First Bank would not have made the Loans that caused more than $11 million in losses, as alleged below.

### *Borrower A[1] – Defendants Coleman and Conklin*

32.    On or about May 6, 2005, based on the underwriting and recommendations of Coleman and Conklin, the CPC approved a $2,925,000 residential construction loan to Borrower A (the "Borrower A loan").  On or about May 10, 2006, based on the underwriting and recommendations of Coleman and Conklin, the CPC approved a modification of the Borrower A loan that included the funding of an additional $550,000.

---

[1]    Borrowers A and B, referenced herein, represent individual borrowers whose names have been withheld to protect their privacy.  Corporations A and B are closely connected to Borrower A, and the identification of Corporations A and B would make the identity of Borrower A transparent.  The names of these borrowers and corporations have been provided to the defendants through their counsel pursuant to a confidentiality agreement.

COMPLAINT AND JURY DEMAND - Page 9

33.     Between July 2005 and November 2007, the Bank disbursed all $3,475,000 of the Borrower A loan.

34.     The Credit Memo for the Borrower A loan stated that the purpose of the loan was to provide funding for the construction of a 10,205 square-foot custom home in the Bellevue Farms subdivision in Blaine County, Idaho.

35.     The Credit Memo stated that refinancing the loan through a permanent mortgage was to be the primary source of repayment, augmented by the sale of Borrower A's then-primary residence.  The Credit Memo requested the CPC's approval for First Bank to fund the permanent mortgage, subject to the condition that Borrower A sell his then-primary residence.  The secondary sources of repayment were to be the borrower's liquid assets and/or the sale of the collateral.  The Credit Memo listed the borrower's liquid assets as a secondary source of repayment, but the Credit Memo ignored that First Bank might not have recourse to many of those assets if Borrower A were to default on the loan.  The Credit Memo stated that the Borrower A loan would be secured by a first deed of trust on the Borrower A (I) property.

36.     In recommending the Borrower A loan for approval, Coleman and Conklin were negligent, grossly negligent, and breached their fiduciary duties when they violated the Credit Policy and prudent, safe, and sound lending practices by, among other things:

> a.      Erroneously stating in the Credit Memo for the original loan amount that the loan did not require any exceptions to the Credit Policy.  The Borrower A loan violated the Credit Policy in a number of respects, as alleged below.
>
> b.      Failing to perform the required due diligence and analysis of Borrower A's capacity to repay the loan, including failing to verify his sources of income.  The Credit Memo projected Borrower A's annual mortgage payment to be $210,000.  To support this debt, the Credit Memo stated

COMPLAINT AND JURY DEMAND - Page 10

that Borrower A's cash flow after taxes and debt service ("CATADS") was estimated to be $596,000 in 2004 and $513,000 in 2005, as compared to only $55,000 and $73,000 in 2002 and 2003, respectively. The estimated 2004 and projected 2005 CATADS were based on Borrower A's March 10, 2005 financial statement in which he reported he expected to be paid $630,000 in consulting fees. Despite this extraordinary surge in the borrower's projected cash flows, Defendants Coleman and Conklin failed to verify the existence of these consulting contracts and the likelihood they would be paid. Furthermore, Borrower A's financial statement showed that the same entities that supposedly planned to pay him $630,000 per year already owed him $368,797, suggesting that these entities may not have the capacity to pay the consulting fees at all. Had Coleman and Conklin investigated the companies that were supposed to pay Borrower A $630,000 per year, they would have learned that the corporation that accounted for more than $200,000 of the projected consulting fees ("Corporation A") earned $0.00 in revenue and suffered a net *loss* of more than $800,000 in its most recently-reported quarter, ended December 31, 2004. In addition, the corporation that accounted for $150,000 of the projected consulting fees of Borrower A's total notes receivable ("Corporation B") reported annual revenues of $2,500, annual net *loss* of more than $400,000, and total assets of less than $60,000 as of December 31, 2004. Excluding the $630,000 from Borrower A's cash flow, Borrower A's estimated CATADS for 2004 and 2005 would have been *negative* $34,000 and *negative* $117,000, respectively. The only other sources of income listed in Borrower A's March 10, 2005 financial

statement were rent and securities trading, which were $24,000 and $50,000, respectively.  In other words, Borrower A did not have the capacity to repay the loan, and the Credit Memo grossly inflated Borrower A's income by including $630,000 in projected consulting fees from companies that were nearly defunct.

c.  Failing to perform the required due diligence and analysis of Borrower A's creditworthiness, and providing erroneous information regarding his assets in the Credit Memo.  The Credit Memo stated that Borrower A held $1,162,000 in marketable securities in three separate brokerage accounts.  This was inaccurate because the largest account, which held $747,000 in marketable securities, was owned by the consulting and venture capital firm that Borrower A jointly owned with his wife.  Although his wife authorized him to use their company's assets to fund the construction of their custom-built house, the Credit Memo stated that the Borrower A loan was to Borrower A, "a married man as his sole and separate property."  The CPC expressly made verification that "liquidity and property [were] in borrower's name solely" a condition of its approval of the loan.  As such, the company's liquid assets should not have been included as his liquid assets in the Credit Memo.  Instead of verifying Borrower A's liquid assets as the Credit Policy and the CPC required, the Credit Memo erroneously inflated Borrower A's liquid assets by including assets held by the company.  In addition, all $1,162,000 in marketable securities was in highly volatile penny-stocks that were not traded on any national stock exchange.  Many of the stocks were of the same corporations that supposedly owed Borrower A on the notes receivable discussed above.

COMPLAINT AND JURY DEMAND - Page 12

For example, the Credit Memo stated that Corporation B's stock jumped from $0.085 per share in January 2005 to $0.25 in February 2005, resulting in a $301,000 increase in the value of the portfolio of the couple's company.  Moreover, Borrower A's checking account statement for the period from February 4 through March 9, 2005 showed that he made a single deposit of $255,000 that posted to his account on March 2. This single deposit accounted for more than 72% of Borrower A's cash, yet the Credit Memo failed to explain the circumstances surrounding this deposit and Defendants Coleman and Conklin failed to document any due diligence into this substantial deposit.

d. Failing to perform even a minimal amount of due diligence into the borrower's background.  Borrower A had been convicted of two felony counts of wire fraud, and in a separate matter, a federal court had ruled that Borrower A committed fraud by manipulating the stock price of Corporation A.  In its final judgment, the court ordered Borrower A to disgorge $449,980.  Conklin and Coleman could have discovered Borrower A's manipulation of Corporation A's stock price and his convictions for wire fraud by searching for Borrower A's name on an Internet search engine.  Moreover, documents in the loan file stood as red flags to Conklin and Coleman that such a search should have been conducted.  As noted above, Borrower A's March 10, 2005 financial statement listed notes receivable from Corporation A as an asset.  In addition, two of Borrower A's personal brokerage account statements showed that he owned 129,000 shares of Corporation A.  Even though Borrower A was a new customer of the Bank and self-employed, Coleman

COMPLAINT AND JURY DEMAND - Page 13

and Conklin did not even require Borrower A to submit a completed loan
application.  Moreover, they did not include in the original Credit Memo a
request for an exception to the Credit Policy for their failure to obtain a
completed loan application.

e.      Repeating some of the gross errors and inaccurate information from the
original Credit Memo in the Credit Memo for the $550,000 increase in the
Borrower A loan on May 10, 2006.  The Credit Memo for the
modification stated that Borrower A's CATADS in 2004 was $597,000,
deriving mostly from the same $630,000 in notes receivable discussed
above.  This $597,000 contrasted sharply with Borrower A's reported
income after taxes, debt service, and other deductions of only $86,748,
which was the amount reflected in Borrower A's 2004 Individual Income
Tax Return.  Instead of explaining this discrepancy, the Credit Memo
included outdated information about the jump in Corporation B's stock
price.  The Credit Memo stated that the stock "increased from $.085/share
to $.250/share in one month, resulting in a $301M increase in portfolio
value for [Borrower A]."  The Credit Memo failed to mention that this
"increase" occurred over one year earlier, from January 2005 to February
2005, and that the stock was trading at only $0.06 per share in May 2006.

f.      Recommending the funding of an additional $550,000 on May 10, 2006,
even though they did not have a current appraisal of the collateral.  The
appraisals they had were dated February 24, 2005, February 25, 2005, and
May 4, 2005–all over one year old.  A current appraisal was especially
important because the primary source of repayment was the pre-approved
refinancing by Wells Fargo that was subject to, among other things, a

COMPLAINT AND JURY DEMAND - Page 14

recertification of the February 24, 2005 and May 4, 2005 appraisals.

37.    Defendants Coleman and Conklin recommended the Borrower A loan for approval even though their lack of due diligence and credit analysis violated the Credit Policy and prudent, safe, and sound lending practices.  The required underwriting would have demonstrated, among other things, that Borrower A's income was erroneously reported and inflated in the Credit Memo, Borrower A's notes receivable were from nearly-defunct corporations and were unreliable sources of income, Borrower A lacked the cash flow to repay the loan, the bulk of Borrower A's liquid assets were held by his and his wife's consulting firm, Borrower A's and his consulting firm's marketable securities were highly volatile penny-stocks, the borrower had been convicted of fraud, the Bank did not have a current appraisal to support the $550,000 of additional funding, the original loan and the modification required multiple exceptions to the Credit Policy, and neither the Borrower A loan nor the modification should have been recommended to the CPC for approval.

38.    In or about May 2008, Borrower A defaulted on the Borrower A loan.  The borrower's assets and the collateral were insufficient to pay off the loan.  After Plaintiff was appointed as Receiver, Plaintiff sold the collateral and received only $326,052 in net proceeds.

39.    As a result of the actions and inactions of Defendants Coleman and Conklin with respect to the Borrower A loan, First Bank lost more than $3.1 million.

### *Sweetwater – Defendants Coleman and Conklin*

40.    On or about December 7, 2006, based on the underwriting and recommendations of Coleman and Conklin, the CPC approved a $5.5 million participation in an $11.0 million acquisition and development loan to Sweetwater Company, LLC (the "Sweetwater loan").

41.    On or about December 13, 2006, First Bank disbursed all $5.5 million of its portion of the Sweetwater loan.  On or about May 11, 2007, the originating bank bought back $750,000 of the loan from First Bank.

COMPLAINT AND JURY DEMAND - Page 15

42.     The Credit Memo for the Sweetwater loan stated that the purpose of the loan was to fund "Land Development."

43.     The Credit Memo stated that the primary source of repayment was to be refinancing of the project through a construction loan.  The secondary sources of repayment were to be recourse to the guarantors and/or the sale of the collateral.

44.     The Credit Memo also stated that the Sweetwater loan would be secured by a first deed of trust on "Phases II – IV" of the Sweetwater development.

45.     In underwriting and recommending the Sweetwater loan for approval, Coleman and Conklin were negligent, grossly negligent, and breached their fiduciary duties when they violated the Credit Policy and prudent, safe, and sound lending practices by, among other things:

a.     Erroneously stating in the Credit Memo that the loan did not require any exceptions to the Credit Policy.  The Sweetwater loan violated the Credit Policy in a number of respects, as alleged below.

b.     Failing to perform due diligence or analysis of the proposed development of the Sweetwater land.  The description of the project stated simply, "Officer is requesting approval for a 50% participation in an $11 [million] loan . . . to the above mentioned borrowers at the above described terms." Coleman and Conklin failed to do any due diligence into the lot-development project that they recommended to the CPC for funding. Their failure to do so was inexcusable in light of the fact that Sweetwater Company, LLC was supposedly planning to develop the property held by its sole owning member, the 474 Club, LLC ("474 Club") which had previously borrowed over $12.2 million, $4.0 million of which came from First Bank, to finance the acquisition of the Sweetwater land.

c.     Using the wrong LTV in the Credit Memo to support liquidation of the

COMPLAINT AND JURY DEMAND - Page 16

collateral as a viable secondary source of repayment, when using the correct LTV would have shown that the secondary source of repayment was not viable.  The Credit Memo should have used the combined LTV because there were two loans that were essentially secured by the same real estate.  When the Sweetwater loan was made, 474 Club—the sole member of Sweetwater Company, LLC and a guarantor of the Sweetwater loan—still owed $12,231,285 on its loan for the acquisition of all the Sweetwater land, *i.e.*, the land for Phases I, II, III, and IV of the Sweetwater development.  The Sweetwater land was the collateral for the 474 Club loan, and approximately, $9,151,674 of the 474 Club loan was attributable to the land that was to be developed into Phases II – IV, which comprised the Bank's security for the Sweetwater loan.  Taking into account the portion of the 474 Club loan that was attributable to Phases II – IV, the combined LTV of the Sweetwater loan was 127.9%.  The Credit Memo, however, did not provide the combined LTV.  Instead, the Credit Memo stated that the LTV was only 69.8%, which was calculated by dividing the $11,000,000 Sweetwater loan by the $15,750,000 "Appraised Value" of Phases II – IV.  The 69.8% LTV was inaccurate because it ignored the fact that the 474 Club loan and the Sweetwater loan were both essentially secured by Phases II – IV.  Instead of warning the CPC that the project was overleveraged and that the combined LTV far exceeded the Credit Policy limit, the Credit Memo inaccurately championed "the Bank's LTV position and the development activity in Hailey" as reasons why "the Bank could fire sell this property with little to no loss of principal to the Bank."

d.      Failing to provide any analysis of the LTC.  Coleman and Conklin failed
to perform the minimal amount of due diligence that was necessary to
ascertain the cost of the project to the borrower.  Without knowing the cost
of the project, it was impossible to calculate the LTC.  The Credit Memo
omitted any discussion of the LTC, and inaccurately stated that the loan
required no exceptions to the Credit Policy.

e.      Failing to apply and enforce the Credit Policy's requirement that the
borrower contribute equity of at least 25% to the project.  Because
Coleman and Conklin failed to perform any due diligence into the
Sweetwater transaction, they could not and did not analyze the Bank's
requirement that the borrower contribute equity of at least 25% to the
project.  In fact, the Credit Memo omitted any discussion of the equity
contribution requirement.

f.      Failing to disclose that the Sweetwater property was in a Special Flood
Hazard Area, and failing to correct the appraiser's erroneous assumption
that there was no flood hazard.  The September 6, 2006 appraisal of the
property that the Credit Memo relied upon stated that "[n]o portion of the
subject [property] lies within a floodplain."  This directly contradicted the
May 31, 2005 flood certificate that the Bank received from First American
Flood Data Services which indicated that the "subject property is
PARTIALLY WITHIN a Special Flood Hazard Area."  In addition, the
August 14, 2006 Planned Unit Development Agreement between
Sweetwater Company, LLC, 474 Club, and the City of Hailey included a
provision that required Sweetwater Company, LLC to pay for a flood plain
study with the goal of amending the floodplain map.  Had the appraiser

COMPLAINT AND JURY DEMAND - Page 18

known that the Sweetwater property was partially within a Special Flood Hazard Area, the appraised value of the Sweetwater property would have been much lower.

g.      Recommending the Sweetwater loan, even though the amount exceeded the Bank's legal lending limit and violated the Credit Policy.  Based on the Bank's September 30, 2006 Thrift Financial Report, the Bank's legal lending limit was approximately $5,259,900.  The Sweetwater loan was for $5.5 million, which exceeded First Bank's legal lending limit.

h.      Failing to analyze the effect of the guarantors' contingent liabilities on their ability to repay the loan.  Although the guarantors' combined liquid assets were worth approximately $20,339,000, one guarantor accounted for approximately $13,237,000 of that amount.  That guarantor had contingent liabilities in the form of loan guarantees for various commercial entities which totaled approximately $43,007,000.  The vast majority of that amount—$41,716,000—consisted of loan guarantees for 474 Club.  Aside from a reference to fully-vested stock options that were worth approximately $69,856,000, the credit memo contained no analysis regarding the effect that this guarantor's loan guarantees for the borrower's sole owning member might have on the guarantors' ability to repay the Sweetwater loan.

46.     Defendants Coleman and Conklin recommended the Sweetwater loan for approval even though their due diligence and credit analysis were deficient and in violation of the Credit Policy and prudent, safe, and sound lending practices.  The required underwriting would have demonstrated, among other things, that the purpose of the Sweetwater loan was unspecified, speculative, and unsound, the combined LTV far exceeded the limit of 75% under

the Loan Policy, the borrower most likely did not have sufficient equity in the project, the appraised value did not factor in the Special Flood Hazard Area, the loan amount exceeded the Bank's legal lending limit, the primary guarantor's contingent liabilities negatively affected his ability to support the loan, the loan required multiple exceptions to the Credit Policy, and the Sweetwater loan should not have been recommended to the CPC for approval.

47.     In or about December 2008, Sweetwater Company, LLC defaulted on the Sweetwater loan.  The guarantors' assets and the collateral were insufficient to pay off the loan. On October 22, 2009, Plaintiff sold the loan to a financial institution for $975,427.

48.     As a result of the actions and inactions of Defendants Coleman and Conklin with respect to the Sweetwater loan, First Bank incurred damages in excess of $3.7 million.

### *Sage – Defendants Coleman, Jansen, and Kaye*

49.     On or about January 4, 2007, based on the underwriting and recommendations of Coleman, Jansen, and Kaye, the CPC approved a $7.5 million lot acquisition loan to Sage Capital, LLC and Borrower B (the "Sage loan").  Although the CPC approved a $7.5 million loan, the January 9, 2007 promissory note showed a principal amount of $7,361,500, which matched the amount listed in the Credit Memo.  Pursuant to a participation agreement dated January 10, 2007, First Bank participated out 33% of the loan to Rawlins National Bank ("Rawlins") and funded the remaining $4,932,205.

50.     On or about January 12, 2007, the Bank disbursed all $4,932,205 of the Sage loan.

51.     The Credit Memo for the Sage loan stated that the purpose of the loan was to provide funding for the acquisition of 40 residential lots located in Teton Springs All-Season Resort in Victor, Idaho.

52.     The Credit Memo stated that the primary source of repayment was to be the sale of the lots.  The secondary sources of repayment were to be the liquidation of the collateral

and/or recourse to the guarantors.

53.     The Credit Memo also stated that the Sage loan would be secured by a first deed of trust on the Sage property and a first deed of trust on 57.01 acres of vacant land located near Cedar City, Utah.

54.     In underwriting and recommending the Sage loan for approval, Coleman, Jansen, and Kaye were negligent, grossly negligent, and breached their fiduciary duties when they violated the Credit Policy and prudent, safe, and sound lending practices by, among other things:

> a.     Inaccurately stating in the Credit Memo that the loan required only one exception to the Credit Policy related to the borrower's lack of a cash contribution to the project.  The Sage loan violated the Credit Policy in a number of other respects, as alleged below.

> b.     Failing to perform the required due diligence and analysis of the supposed contracts of sale for 21 of the 40 lots, and inaccurately stating that 21 lots were "under contract" to be sold.  The Credit Memo stressed that 21 of the 40 lots were under contracts of sale and even highlighted the contracts as a mitigating factor for the Sage loan's other risks, stating that the sales "will greatly reduce the CLTV [combined LTV] of [the] remaining collateral and principal balance."  This statement was inaccurate in the following two respects: (1) Sage Capital's purchase of the 40 lots was going to void all the contracts of sale; and (2) all 21 of the contracts had already expired. With regard to the effect of Sage Capital's planned acquisition of the 40 lots, the agreement between Sage Capital and Teton Springs required Teton Springs to void all of the contracts of sale before Sage Capital's purchase could close.  Voiding the 21 contracts of sale was necessary because they were all contracts between Teton Springs and individual

buyers, and Teton Springs would not have been able to convey clear title to Sage Capital had it not voided them.  In addition, none of the sales contracts were still enforceable under their own terms.  Each contract required the deal to close on or before a "Closing Date," and all of the Closing Dates were on or before September 15, 2006.  The CPC approved the Sage loan more than three months after the contracts expired, on January 4, 2007.  This was not disclosed to the CPC, and Defendants failed to document any efforts to verify whether these lots would actually be sold.  The Credit Memo incorrectly presented the 21 contracts of sale as a mitigating factor, when in fact none of those contracts survived Sage Capital's purchase of the lots from Teton Springs, nor were they enforceable.  The fact that the 21 contracts were illusory and of no real value to First Bank made the primary source of repayment—*i.e.*, sale of the lots—all the more speculative.

    c.       Failing to perform the required due diligence and analysis of Sage Capital's capacity to repay the loan, and including gross errors and inaccurate information in the Credit Memo that artificially inflated Sage Capital's income.  Under the section titled "Primary Source of Repayment," the Credit Memo incorrectly stated that Sage Capital's 2005 Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") was $402,000.  According to Sage Capital's 2005 tax return, Sage Capital's EBITDA was *negative* $468,767.  The discrepancy arose from $435,000 that the tax return listed as an expense but that the Credit Memo counted as income.  To exacerbate this misstatement of Sage Capital's 2005 EBITDA, the "Primary Source of Repayment" section of

COMPLAINT AND JURY DEMAND - Page 22

the Credit Memo stated that Sage Capital's Net Cash After Operations ("NCAO") for the first 10.5 months of 2006 was $969,000 but omitted the NCAOs for 2004 and 2005. The omission resulted in a misleading picture of Sage Capital's financial condition because the 2004 and 2005 NCAOs were *negative* $3.686 million and *negative* $21.845 million, respectively. Although these negative NCAOs were in the Credit Memo's supporting materials, they were not listed in the "Primary Source of Repayment" section. In addition, the swing from negative $21,845,000 in 2005 to positive $969,000 in the first 10.5 months of 2006 constituted a major change in cash flow, which the Credit Memo was required to explain. Instead of explaining this drastic change, the Credit Memo buried the negative numbers in the supporting materials.

d.    Failing to obtain appraisals for the two pieces of collateral from approved appraisers. Neither the appraiser of the Teton Springs lots nor the appraiser of the collateral in Cedar City, Utah was on the list of approved appraisers when each was engaged by the Bank to conduct the appraisals.

e.    Relying on an appraisal of the Teton Springs collateral that violated USPAP and underwriting standards. Instead of requesting an appraisal of the value of the project as a whole, Kaye, on information and belief, requested and relied on an appraisal purporting to appraise each individual lot separately by using neighboring lots as sales comparables. Each appraisal was eight pages long and in the same format. To account for the multiple-lot purchase, each lot's appraisal merely stated that the purchase price was "discounted below fair market value" without elaborating on the methodology or calculation of the discount.

COMPLAINT AND JURY DEMAND - Page 23

f.     Failing to require signed financial statements from the guarantors and failing to perform due diligence into the financial information provided by the guarantors.  The file for the Sage loan did not include any signed personal financial statements from any of the guarantors.  Although the Credit Memo included financial data for each guarantor, there were no financial statements in the loan file to support any of those figures, and nothing in the loan file indicates that any due diligence was done to confirm the guarantors' reported financial information.  In addition, the Credit Memo failed to advise the CPC that the Defendants on this loan had neither received nor reviewed the guarantors' signed financial statements, as required by the Credit Policy.

g.     Failing to require signed loan applications from the borrowers and failing to advise the CPC of this violation of the Credit Policy.  The Credit Policy required borrowers to submit signed loan applications, but the Defendants on this loan failed to ensure this requirement was met.  Moreover, they failed to notify the CPC that they had not complied with the Credit Policy, and they omitted this violation from the Credit Memo.

h.     Failing to comply with the Credit Policy's minimum credit score requirement.  The Credit Memo stated that the LTV for this loan was 70.97%.  Because the LTV exceeded 70%, the borrowers were required to have credit scores of 700 or higher.  Borrower B's credit score, however, was only 655.

55.     Defendants Coleman, Jansen, and Kaye recommended the Sage loan for approval even though their due diligence and credit analysis were deficient and in violation of the Credit Policy and prudent, safe, and sound lending practices.  The required underwriting would have

COMPLAINT AND JURY DEMAND - Page 24

demonstrated, among other things, that Sage Capital's purchase of the 40 lots was going to void all 21 contracts of sale, the Credit Memo contained inaccurate and, therefore, misleading financial data for Sage Capital, the appraisals of the 40 lots did not conform to USPAP, Borrower B had an insufficient credit score, and the Sage loan should not have been recommended to the CPC for approval.

56.     Kaye's annual salary was $68,250, but under the Bank's incentive plan, Kaye received a bonus in excess of $16,000 for originating the loan.  Kaye left the Bank a month after he received the bonus.

57.     In or about July 2008, Sage Capital, LLC and Borrower B defaulted on the Sage loan.  The sale of the lots did not repay the loan; the collateral was insufficient; and the guarantors did not cover the loan.  On October 22, 2009, Plaintiff sold the loan to a financial institution for $443,898.

58.     As a result of the actions and inactions of Defendants Coleman, Jansen, and Kaye with respect to the Sage loan, First Bank incurred damages in excess of $4.4 million.

## V.     CAUSES OF ACTION

### COUNT I—BREACH OF FIDUCIARY DUTIES

59.     The FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1-58 above as if fully set out in this Count.

60.     As officers of the Bank, at all times, the Defendants owed to First Bank the fiduciary duties of care and loyalty and the obligation to exercise their powers in good faith and in a manner reasonably believed to be in the best interests of the Bank.

61.     The Defendants' fiduciary duties included, among other things: conducting the business of First Bank in a manner consistent with safe and sound lending practices; using prudent procedures for underwriting and recommending loans for approval; underwriting and recommending loans for approval in accordance with First Bank's Credit Policy; acting with the

COMPLAINT AND JURY DEMAND - Page 25

requisite care in the discharge of their duties; and informing themselves and the CPC of all the material information reasonably available to them.

62.     For each Loan, material information reasonably available to the Defendants included, among other things, information regarding the reliability and adequacy of the repayment sources, the value and sufficiency of the collateral, the creditworthiness of the borrowers and guarantors, the LTV and/or LTC, the risks associated with a downturn in the real estate market, and any other information necessary to ensure that the proposed Loan complied with First Bank's Credit Policy and prudent, safe, and sound lending practices.

63.     First Bank reasonably reposed trust and confidence in each of the Defendants and believed they would exercise the trust and confidence reposed in them with great care.

64.     The Defendants each knew or should have known that the Bank was placing its trust and confidence in them, and the Bank did place its trust and confidence in each of them, as demonstrated by the fact that each of the Defendants was an officer of the Bank and had the responsibility to underwrite and recommend loans for approval.  Trust and confidence was also placed in the Defendants either because they were charged with following the Bank's Credit Policy.

65.     With respect to the Loans, each of the Defendants possessed significant access to relevant knowledge and facts due to each Defendant's position at the Bank and the confidence each Defendant invited others to repose in him or her with respect to such Loans, based on the fact that each Defendant actively engaged in the underwriting of one or more of the Loans and recommended one or more of the Loans for approval.

66.     As officers of the Bank, and as individuals underwriting the Loans and recommending them for approval, each of the Defendants was in a special position of influence and power, and each of them exercised that influence and power in a manner that directly caused harm to the Bank.

COMPLAINT AND JURY DEMAND - Page 26

67.     The Defendants breached their fiduciary duties to the Bank by, among other things, committing the acts and omissions alleged above.

68.     As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Plaintiff has suffered damages in excess of $11 million.  Plaintiff reserves the right to amend this Complaint to allege additional damages.

### COUNT II—NEGLIGENCE
### (Pleaded in the Alternative to Count I)

69.     The FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1-58 and 65-66 above as if fully set out in this Count.

70.     Under Idaho law, as officers of the Bank, the Defendants can be held personally liable for loss or damage to First Bank caused by their negligence.

71.     As officers of the Bank, at all times, the Defendants owed to First Bank a duty to use care, skill, and diligence in the performance of their duties as officers of First Bank.

72.     The Defendants' duty of care to First Bank included, among other things: conducting the business of First Bank in a manner consistent with safe and sound lending practices; using prudent procedures for underwriting and recommending loans for approval; underwriting and recommending loans for approval in accordance with First Bank's Credit Policy; and informing themselves, prior to making a business decision, of all the material information reasonably available to them.

73.     For each Loan, material information reasonably available to the Defendants included, among other things, information regarding the reliability and adequacy of the repayment sources, the value and sufficiency of the collateral, the creditworthiness of the borrowers and guarantors, the LTV and/or LTC, the risks associated with a downturn in the real estate market, and any other information necessary to ensure that the proposed Loan complied with First Bank's Credit Policy and prudent, safe, and sound lending practices.

COMPLAINT AND JURY DEMAND - Page 27

74.     The Defendants breached their duties and were negligent by, among other things, committing the acts and omissions alleged above.

75.     As a direct and proximate result of the Defendants' negligence, Plaintiff has suffered damages in excess of $11 million.  Plaintiff reserves the right to amend this Complaint to allege additional damages.

**COUNT III—GROSS NEGLIGENCE**
**(Pleaded in the Alternative to Count II)**

76.     The FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1-58 and 65-66 above as if fully set out in this Count.

77.     Under Idaho law and 12 U.S.C. § 1821(k), as officers of the Bank, the Defendants can be held personally liable for loss or damage to First Bank caused by their gross negligence.

78.     As officers of the Bank, at all times, the Defendants owed to First Bank a duty to use care, skill, and diligence in the performance of their duties as officers of First Bank.

79.     The Defendants' duty of care to First Bank included, among other things: conducting the business of First Bank in a manner consistent with safe and sound lending practices; using prudent procedures for underwriting and recommending loans for approval; underwriting and recommending loans for approval in accordance with First Bank's Credit Policy; and informing themselves and the CPC of all the material information reasonably available to them.

80.     For each Loan, material information reasonably available to the Defendants included, among other things, information regarding the reliability and adequacy of the repayment sources, the value and sufficiency of the collateral, the creditworthiness of the borrowers and guarantors, the LTV and/or LTC, the risks associated with a downturn in the real estate market, and any other information necessary to ensure that the proposed Loan complied with First Bank's Credit Policy and prudent, safe, and sound lending practices.

81.     The Defendants breached their duties and were grossly negligent by, among other things, committing the acts and omissions alleged above.

82.     As a direct and proximate result of the Defendants' gross negligence, Plaintiff has suffered damages in excess of $11 million.  Plaintiff reserves the right to amend this Complaint to allege additional damages.

## VI.     <u>RELIEF REQUESTED</u>

WHEREFORE, the FDIC-R demands a trial by jury and judgment in its favor and against the Defendants as follows:

A.      Determining the amount of damages caused by the Defendants;

B.      Determining the amount of accrued interest (including pre-judgment interest) on such damages;

C.      Awarding the FDIC-R the full amount of damages and accrued interest;

D.      Awarding the FDIC-R its costs and other expenses incurred by it in connection with this proceeding; and

E.      Granting the FDIC-R such other and further relief as this Court may deem just and proper under the circumstances.

## VII.     <u>JURY DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the FDIC-R demands a trial by jury.

DATED this   29th   day of July, 2014.

ELAM & BURKE, P.A.


By:    /s/ Joshua S. Evett
      Joshua S. Evett, Of the firm
      Attorneys for Plaintiff

COMPLAINT AND JURY DEMAND - Page 29